## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| TIMOTHY ANDERSON;<br>LINYALE SHANTEL BAGLEY;<br>SAMUEL BELLAMY;<br>DARIAN BOWMAN;<br>PAULA BUSHMAN;<br>BERTHA HENRY;<br>JOSEPH DAVID HOCK;<br>JAMES THOMAS JONES III;<br>PATRICK MICHAEL KELLY;<br>DAVID CHARLES MADRID;<br>JOSEPH MAKI;<br>PAUL MELANSON;<br>NICOLE PERRY;<br>TIMOTHY GOLD RANDOLPH;<br>JOHNATHAN REBHOLZ;<br>RON SMITH;<br>STEVEN CARL WAIT;<br>WESLEY WHITMAN, as Parent on behalf of<br>A.W., a Minor Child; and<br>BRILEY WHITMAN, | Case No.: 1:25-cv-23801<br><br>COMPLAINT WITH JURY DEMAND |

*Plaintiffs*,

v.

3M COMPANY (f/k/a Minnesota Mining and
Manufacturing Co.);
AGC CHEMICALS AMERICAS INC.;
AMEREX CORPORATION;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS INCORPORATED;
CHUBB FIRE, LTD.;
CLARIANT CORPORATION;
CORTEVA, INC.;
DEEPWATER CHEMICALS, INC.;
DUPONT DE NEMOURS, INC.;
DYNAX CORPORATION;
E. I. DUPONT DE NEMOURS AND COMPANY;
MINE SAFETY APPLIANCES CO., LLC.;
NATION FORD CHEMICAL COMPANY;

NATIONAL FOAM, INC.;
RAYTHEON TECHNOLOGIES CORPORATION
(f/k/a United Technologies Corporation);
THE CHEMOURS COMPANY;
THE CHEMOURS COMPANY FC, LLC; and
JOHN DOE DEFENDANTS 1-49,

    *Defendants*.

---

**COMPLAINT**

COMES NOW, Plaintiffs TIMOTHY ANDERSON, LINYALE SHANTEL BAGLEY, SAMUEL BELLAMY, DARIAN BOWMAN, PAULA BUSHMAN, BERTHA HENRY, JOSEPH DAVID HOCK, JAMES THOMAS JONES III, PATRICK MICHAEL KELLY, DAVID CHARLES MADRID, JOSEPH MAKI, PAUL MELANSON, NICOLE PERRY, TIMOTHY GOLD RANDOLPH, JOHNATHAN REBHOLZ, RON SMITH, STEVEN CARL WAIT, WESLEY WHITMAN, as Parent on behalf of A.W., a Minor Child, and BRILEY WHITMANN, by and through their undersigned counsel, and brings this action against Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), AGC Chemicals Americas, Inc., Amerex Corporation, Archroma U.S., Inc., Arkema, Inc., BASF Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, ChemDesign Products, Inc., Chemguard, Inc., Chemicals Incorporated, Chubb Fire, Ltd., Clariant Corporation, Corteva, Inc., Deepwater Chemicals, Inc., DuPont de Nemours, Inc., Dynax Corporation, E. I. DuPont De Nemours and Company, Mine Safety Appliances Co., LLC, Nation Ford Chemical Company, National Foam, Inc., Raytheon Technologies Corporation (f/k/a United Technologies Corporation), The Chemours Company, The Chemours Company FC, LLC, and John Doe Defendants 1-49 (collectively, "Defendants"), and allege as follows:

    I.    **INTRODUCTION**

1.      This action arises from both the foreseeable contamination of groundwater by the use of aqueous film-forming foam ("AFFF") products that contained per- and poly-fluoroalkyl substances ("PFAS").

2.      Unbeknownst to Plaintiffs, Defendants have manufactured, marketed, distributed, sold, and/or used PFAS and PFAS-containing materials in protective clothing specifically designed for firefighters ("turnouts") and in non-military specification Class B firefighting foams ("Class B foam").[1]

3.      PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, heat, and water. PFAS include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS") as well as "short-chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

4.      PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain. PFAS exposure in humans can occur through inhalation, ingestion, and dermal contact.[2]

**Aqueous Film-Forming Foam**

5.      For decades, Defendants manufactured, marketed, distributed, and sold aqueous film-forming foam ("AFFF") or its component fluorochemicals and fluorosurfactants containing per- and polyfluoroalkyl substances ("PFAS") (collectively, "AFFF Products"). Despite knowing that when used as directed AFFF releases toxic PFAS chemicals into the environment, and despite knowing that PFAS pose significant threats to the environment and human health, Defendants

---

[1] Class B foams are synthetic "soap-like" foams that spread rapidly across the surface of a fuel or chemical fire to stop the formation of flammable vapors. The most common Class B foam is aqueous film-forming foam (or "AFFF").
[2] Suzanne E. Fenton, MS, PhD, *PFAS Collection*, Environmental Health Perspectives (February 22, 2019), https://ehp.niehs.nih.gov/curated-collections/pfas.

continued to manufacture, market, distribute, and sell AFFF Products—and they did so without warning the public, and without taking any steps to modify their products to avoid these harms.

6.      AFFF is a specialized substance designed to extinguish petroleum-based fires. It has been used for decades by military and civilian firefighters to extinguish fires in training and in response to Class B fires.

7.      PFAS are synthetic and highly toxic, carcinogenic chemicals that include perfluorooctane sulfonate ("PFOS"), perfluorooctanoic acid ("PFOA"), GenX chemicals, and/or other per- and polyfluoroalkyl substances and their precursors. PFAS bind to proteins in the blood of humans exposed to the substance and persists in the body over long periods of time. PFAS are also known as "forever chemicals" because they are immune to degradation, concentrate in human blood, bones, and organs, and increase in concentration up the food chain.

8.      PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy induced hypertension.

9.      Because of the disastrous human health effects posed by PFAS, the Plaintiffs consumption, inhalation, or dermal absorption of Defendants' PFAS chemicals substantially increased the risk that each Plaintiff will develop serious medical conditions associated with PFAS exposure.

10.      As Defendants were fully aware, PFAS contamination is devastating to the environment. When AFFF is released, PFAS quickly migrate from soil to surface water and groundwater, entering drinking water supplies. These chemicals then wreak havoc at each level of the food chain, building up in plants, fish, wildlife, and eventually humans. These chemicals then

continue their migratory cycle in the environment by being transported through wastewater and biosolids.

11.     PFAS contamination also poses serious threats to human health. PFAS exposure has been associated with serious, adverse health effects in humans and can occur through inhalation, ingestion, and dermal contact. Research has linked human PFAS exposure to increased cholesterol levels, liver damage or changes in liver function, decreases in body vaccine response, increased risk of high blood pressure or preeclampsia in pregnant women, lower infant birth weights, and higher risks of kidney and testicular cancer.

12.     Defendants' AFFF Products have been stored and released in areas within and adjacent to numerous United States Air Force Military Bases. Because of Defendants' reckless and unlawful conduct, many United States Air Force Bases' drinking water and natural resources including its groundwater, surface water, soil, plants and animal life—are contaminated with toxic PFAS chemicals.

13.     Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the United States when they knew or reasonably should have known that Plaintiff's would repeatedly inhale, ingest and/or have dermal contact with these harmful compounds during firefighting training exercises, in firefighting emergencies, and regular civilian use of water, and that such exposure would threaten the health and welfare of firefighters and civilians exposed to these dangerous and hazardous chemicals.

14.     Defendants' AFFF Products have been stored and released in areas within and adjacent to the various military installations discussed *infra*. Because of Defendants' reckless and unlawful conduct, the Plaintiff's drinking water the military installations natural resources— including its groundwater, surface water, soil, plants and animal life—are contaminated with toxic PFAS chemicals. Defendants collectively designed, marketed, developed, manufactured,

distributed, released, trained users, produced instructional materials, promoted, sold, and/or otherwise released into the stream of commerce AFFF with knowledge that it contained highly toxic and bio-persistent PFAS.

15.     As a result of their conduct and the harms they have caused, Defendants are liable to Plaintiffs for medical monitoring as a result of each Plaintiff's exposure to a PFAS contaminated water supply. Plaintiffs further seek injunctive, equitable, and declaratory relief arising from the same conduct by Defendants.

## II.     JURISDICTION AND VENUE

16.     This Court has jurisdiction over the parties and claims brought herein under 28 U.S.C. § 1331. The claims herein arise from exposure to PFAS contaminated water supplies on or stemming from military installations owned and operated by the United States Government. Many Plaintiffs were exposed as a result of their service duties with the United States Army and/or Air Force, or while residing on or nearby a contaminated military installations as a dependent of a United States service member. Where tort claims arise out of toxic exposure to chemicals on federally owned and operated property, federal enclave jurisdiction exists. Therefore, Plaintiffs' claims present a question arising under federal law and are properly brought in this Court.

17.     Venue is proper in this District Court pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiffs were residents and/or citizens, a substantial part of the events or omissions giving rise to the claims occurred, and/or Defendants conduct business within the district.

18.     The United States District Court for the Southern District of Florida further has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants purposefully manufactured, designed, marketed, advertised, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFAS-containing Fluorochemical Products,

including AFFF, to various locations in the United States and Florida, such that each Defendant knew or should have known that said products would be delivered to areas in Florida for active use including, but not limited to, during the course of training and firefighting activities.

19.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the Defendants engaged in business in the State of Florida.

20.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the Defendants have engaged in substantial, continuous economic activity in Florida, including the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, advertising and/or otherwise being responsible for PFAS chemicals, and that said activity by the Defendants is substantially connected to the Plaintiffs' claims as alleged herein.

21.     Based on information and belief, the Defendants purposefully affiliated themselves with the forum of the State of Florida giving rise to the underlying controversy.

22.     At all times pertinent to this action, the Defendants had actual knowledge that each of the other Defendants was going to intentionally or negligently engage in the tortious misconduct and acts alleged in the causes of action set forth in this complaint, including but not limited to the acts, failures to act, misrepresentations and breaches of duties of care owed by each of the Defendants to Plaintiffs.

23.     Therefore, the exercise of jurisdiction over the Defendants by the United States District Court for the Southern District of Florida does not offend traditional notions of fair play and substantial justice.

24.     Joinder of all parties is proper pursuant to Rule 20(a) of the Federal Rules of Civil Procedure. Defendants are permissively joined in this action because the exposure, injuries, and

relief requested all arise out of similar transactions or occurrences and questions of law and fact are common to all parties.

### III.    PARTIES

#### a.    Plaintiffs

25.    Plaintiff **TIMOTHY ANDERSON** resides at 61 Jasmine Point St., Henderson, NV 89074. Plaintiff was formerly stationed at Lackland Air Force Base (1987 to 1987), Sheppard Air Force Base (1987 to 1987), and Pease Air Force Base (1987 - 1991). Plaintiff also resided in Taylorsville, Utah from 1991 until July 2024 and has since resided in Henderson, Nevada. (hereinafter "Sites"). Plaintiff TIMOTHY ANDERSON was living at the Sites continually from 1987 to 1991. While living on base at the Sites, TIMOTHY ANDERSON was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. TIMOTHY ANDERSON has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff TIMOTHY ANDERSON's exposure, he is at a heightened risk of developing adverse health conditions associated with PFAS exposure.

26.    Plaintiff **LINYALE SHANTEL BAGLEY** is a resident of 3062 Brass Drive, Austell, Georgia, 30106 and a former service member of the United States Army. Plaintiff served at numerous bases contained with PFAS chemicals, including Fort Jackson (Nov 1988-Jan 1989), Fort Lee (Jan 1989-Mar 1989), Fort Ord (Jul 1991-Jul 1993), and Fort Hood (Jul 1993-Aug 1995). LINYALE SHANTEL BAGLEY was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. LINYALE SHANTEL BAGLEY has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to her health. As a direct and proximate result of Plaintiff LINYALE

SHANTEL BAGLEY's exposure, she is at a heightened risk of developing adverse health conditions associated with PFAS exposure.

27.     Plaintiff **SAMUEL BELLAMY** resides at 82 Park View Place NW, Apartment B1 Shallotte, North Carolina 28470. Plaintiff was formerly stationed at Osan Air Force Base, MacDill Air Force Base, Loring Air Force Base, McGuire Air Force Base, Joint Base Charleston Air Force Base, Scott Air Force Base, Al Udeid Air Force Base, and Aviano Air Force Base (collectively the "Sites") from 1979 to 2005 and was either living on the military Sites or adjacent thereto during those times. While living on or adjacent to these Sites, SAMUEL BELLAMY was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. SAMUEL BELLAMY has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff SAMUEL BELLAMY's exposure, he is at a heightened risk of developing conditions associated with PFAS exposure.

28.     Plaintiff **DARIAN BOWMAN** resides at 1223 Victor Ave, Union, New Jersey 07083. Plaintiff served in the United States Army and was stationed at several military installations with PFAS water contamination, including Fort Jackson (October 1980-November 1980), Fort Gordon (November 1980-February 1981), Fort Lewis (February 1981-March 1982), and Fort Drum (September 1983-January 1985). DARIAN BOWMAN was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. DARIAN BOWMAN has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff DARIAN BOWMAN's exposure, he is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

29.     Plaintiff **PAULA BUSHMAN** resides at 4020 Southwest 54th Avenue, Davie, FL 33314. Plaintiff was formerly stationed at MCRD Parris Island, Marine Corps Base Camp Pendleton, Marine Corps Air Station Iwakuni (hereinafter "Sites") collectively from 1981 to 1983 and was either living on the military site location or adjacent thereto during those times. While living on or adjacent to these Sites, PAULA BUSHMAN was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. Plaintiff, PAULA BUSHMAN has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to her health. As a direct and proximate result of Plaintiff PAULA BUSHMAN's exposure, she is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

30.     Plaintiff, **BERTHA HENRY** resides at 12117 Grand Oaks Drive, Gulfport, MS 39503. Plaintiff is a former United States service member who was stationed at Wurtsmith Air Force Base, Kunsan Air Base, Maxwell Air Force Base, Royal Air Force Greenham, Francis E. Warren Air Force Base, and Keesler Air Force Base (collectively the "Sites") from approximately 1980 to 1991. Plaintiff, BERTHA HENRY was exposed to PFAS through daily activity and regularly consumed drinking water containing elevated levels of PFAS. Plaintiff, BERTHA HENRY has been exposed to PFAS for many years as a result of the PFAS contamination at the Sites, including at concentrations hazardous to her health. As a direct and proximate result of Plaintiff BERTHA HENRY's exposure, she is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

31.     Plaintiff **JOSEPH DAVID HOCK** resides at 3751 U.S. 23 Oscoda, Michigan 48750. Plaintiff has been stationed at Wurtsmith Air Force Base (1964 – current)), Fort McClellan (1984), Fort Gordon (1984 to 1987), Fort Huachuca (1987 for 6 months), and Yongsan Garrison (1987 to 1988). Plaintiff has resided in Oscoda, Michigan since discharge from his military service

(hereinafter "Sites"). Plaintiff JOSEPH DAVID HOCK lived at the Sites for 3 months in 1984 and again from 1987 to 1988. While living on or near the Sites, JOSEPH DAVID HOCK was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. JOSEPH DAVID HOCK has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff JOSEPH DAVID HOCK's exposure, he is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

32.     Plaintiff **JAMES THOMAS JONES III** resides at 1242 North High Park Drive Derby, Kansas 67037. Plaintiff was formerly stationed at Lackland Air Force Base (8 weeks in 1986), Sheppard Air Force Base (3 months in 1986), and Wurtsmith Air Force Base (1986–1991). Plaintiff also resided in Oscoda, Michigan (1990–1991); Mulvane, Kansas (1992–2012); Winterville, North Carolina (2012–2014); and Derby, Kansas (2014-present) (collectively the "Sites"). Plaintiff JAMES THOMAS JONES III lived at or near the Sites continually from 1986 to 1991. While living on or near the Sites, JAMES THOMAS JONES III was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. JAMES THOMAS JONES III has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff JAMES THOMAS JONES III's exposure, he is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

33.     Plaintiff **PATRICK MICHAEL KELLY** resides at 504 N 4TH Street Saint Joseph, Illinois 61873. Plaintiff was formerly stationed at Lackland Air Force Base (1986–1987), Kunsan Air Base (1987–1988), and Chanute Air Force Base (1988–1990). Plaintiff also resided in Champaign, IL (1991–1992); Mahomet, IL (1992–1995); Potomac, IL (1996–1997); Saint Joseph, IL (1997–2024); and Oakwood, IL (2024–present) (collectively the "Sites"). Plaintiff PATRICK

MICHAEL KELLY was living at the Sites continuously from 1986 to present day. While living at or near the Sites, PATRICK MICHAEL KELLY was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. Plaintiff, PATRICK MICHAEL KELLY has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff PATRICK MICHAEL KELLY's exposure, he is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

34.     Plaintiff **DAVID CHARLES MADRID** is a resident of 3537 Brittany Street, Springdale, Arkansas 72764. Plaintiff served in the United States Air Force from August 25th, 1977 to September 9th, 1981. Plaintiff was formerly stationed at Lackland Air Force Base for 12 weeks in 1977, then was stationed at George Air Force Base until 1981 (collectively the "Sites"). Plaintiff, DAVID CHARLES MADRID was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. Plaintiff DAVID CHARLES MADRID has been exposed to PFAS chemicals for many years as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff DAVID CHARLES MADRID's exposure, he is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

35.     Plaintiff **JOSEPH MAKI** resides at 509 W Fresno St, Greenwood, AR 72936. Plaintiff was formerly stationed at Lackland Air Force Base and Wurtsmith Air Force Base from 1986 to 1990. Plaintiff also resided on or adjacent to K. I. Sawyer Air Force Base from 2003 to 2020 (collectively the "Sites"). Plaintiff lived on or adjacent to the Sites during these timeframes. While living on or adjacent to the Sites, JOSEPH MAKI was exposed to PFAS through daily activity and regularly consumed drinking water containing elevated levels of PFAS. JOSEPH MAKI has been exposed to PFAS for many years as a result of the PFAS contamination at the

Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff JOSEPH MAKI's exposure, he is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

36.     Plaintiff **PAUL MELANSON** resides 132 Green Street Athol, Massachusetts 01331. Plaintiff was formerly stationed at the Lackland Air Force Base, Travis Air Force Base, Misawa Air Force Base, and Goodfellow Air Force Base (hereinafter the "Sites") from 1986 to 1990 and was living on or near the Sites during those times. While living on or near the Sites, Plaintiff was exposed to PFAS chemicals through daily activity and regularly consumed drinking water containing elevated levels of PFAS. Plaintiff has been exposed to PFAS chemicals for many years as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff PAUL MELANSON's exposure, he is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

37.     Plaintiff **NICOLE PERRY** resides at 33 Woodcliff Dr. Westfield, MA 01085. Plaintiff resided in Westfield, MA (hereinafter the "Site") from 1985 to 2005 and 2023-2025. Plaintiff's drinking water supply at the Site was contaminated with Defendants' PFAS chemicals. While living at the Site, Plaintiff regularly consumed water containing elevated levels of PFAS. Plaintiff has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff NICOLE PERRY's exposure, she is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

38.     Plaintiff **TIMOTHY GOLD RANDOLPH** is a resident of 2524 Berdan Ave, Apt. 1, Toledo, Ohio 43613. Plaintiff served in the United States Army and was stationed at Fort Jackson (16 weeks) and Fort Lewis (1982 to 1985) (collectively the "Sites"). Plaintiff lived on the base at

the Sites. Plaintiff was exposed to PFAS through daily activity and regularly consumed drinking water containing elevated levels of PFAS. TIMOTHY GOLD RANDOLPH has been exposed to PFAS chemicals for many years as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff TIMOTHY GOLD RANDOLPH's exposure, he is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

39.     Plaintiff **JOHNATHAN REBHOLZ** resides at 1226 Banbrige Blvd Fairbanks, Alaska 99701. Plaintiff was the dependent of a United States service member stationed on various United States Air Force Bases know to have PFAS water contamination. Plaintiff lived on Yokoto Air Base, Chanute Air Force Base, Plattsburgh Air Force Base, Royal Air Force Lakenheath, and Eielson Air Force Base (collectively the "Sites") from 1981 to 1997. Plaintiff Johnathan Rebholz regularly obtained and consumed his drinking water from the Sites. As a result, Plaintiff was exposed to PFAS chemicals through his water supplies. Additionally, Plaintiff resided in Fairbanks, Alaska from 1997 to 2005, and from 2007 to present, and was also exposed to PFAS chemicals through the city's water supply. Plaintiff has been exposed to PFAS chemicals for many years as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff JONATHAN REBHOLZ's exposure, he is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

40.     Plaintiff **RON SMITH** resides at 5041 Grand Teton Court DeLand, Florida 32724. Plaintiff is a former Air Force Member who was stationed and/or lived on Lackland Air Force Base, Lowry Air Force Base, Ramstein Air Base, Holloman Air Force Base, Fort Wayne Air National Guard Base, and Hill Air Force Base (the "Sites") from 1993 to 2023. Plaintiff RON SMITH regularly obtained and consumed his drinking water from the Sites and, therefore, was

14

exposed to PFAS chemicals through his water supply. Additionally, Plaintiff resided in DeLand, Florida from 2023 to present. The City of DeLand has elevated PFAS chemicals in its water supply and, therefore, Plaintiff was also exposed to PFAS through the city's water supply. Plaintiff has been exposed to PFAS chemicals for many years as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff RON SMITH's exposure, he is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

41.     Plaintiff **STEVEN CARL WAIT** resides at 2010 Lynwood Ln, Pueblo, Colorado 81005. Plaintiff served in the United States Air Force and was formerly stationed at Lackland Air Force Base (Sept 1971 to Nov 1971), Chanute Air Force Base (Nov 1971 to Jan 1972), McChord Air Force Base (Jan 1972 to Dec 1973), George Air Force Base (Dec 1972 to Dec 1975), Eglin Air Force Base (6 months in 1974), Clark Air Base (Dec 1975 to Nov 1977), Malmstrom Air Force Base (Nov 1977 to 1980), Spangdahlem Air Base (1980 to 1984), and Grand Forks Air Force Base (1984 to 1991) (collectively the "Sites"). Plaintiff also resided in Centralia, WA for 4 months in 1992 and Pueblo, Colorado from 1952 to 1971 and 1999 to present (collectively the "Sites"). Plaintiff was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS chemicals. Plaintiff STEVEN CARL WAIT has been exposed to PFAS chemicals for many years as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff STEVEN CARL WAIT's exposure, he is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

42.     Plaintiff **WESLEY WHITMAN, on behalf of A.W., a minor child**, resides at 711 Ninnekah Street Enid, Oklahoma 73701. Plaintiff worked as a civilian firefighter at Vance Air Force Base, located in Garfield County, Oklahoma (hereinafter the "Sites"), since 2003. A.W. lived

in close proximity to the Site at all relevant times and regularly visited her Wesley Whitman at the Sites, approximately four (4) times per month from 2009 through 2023. During those visits, A.W. frequently consumed water containing elevated levels of PFAS, which was also used to prepare her infant bottle, cook meals, wash dishes, and clean her hands. A.W. has been exposed for many years to PFAS chemicals as a result of the PFAS contamination at the Sites, including at concentrations hazardous to their health. As a direct and proximate result of A.W.'s exposure, she is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

43.     Plaintiff **BRILEY WHITMAN** resides at 711 Ninnekah Street Enid, Oklahoma 73701. Plaintiff's father worked as a civilian firefighter at Vance Air Force Base, located in Garfield County, Oklahoma (hereinafter the "Sites"), since 2003. Plaintiff lived in close proximity to the Site at all relevant times and regularly visited her father at the Sites, approximately four (4) times per month from 2009 through 2023. During those visits, Plaintiff frequently consumed water containing elevated levels of PFAS, which was also used to prepare her infant bottle, cook meals, wash dishes, and clean her hands. BRILEY WHITMAN has been exposed to PFAS chemicals for many years as a result of the PFAS contamination at the Sites, including at concentrations hazardous to her health. As a direct and proximate result of Plaintiff BRILEY WHITMAN's exposure, she is at a significantly increased risk of developing adverse health conditions associated with PFAS exposure.

### b. Defendants

44.     Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of the Fluorosurfactant Products that have and continue to cause injury the Plaintiffs:

a.   Defendant The 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000. 112. Beginning before 1970 and until at least 2002, 3M designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

b.   Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours is registered to do business in the State of Florida.

c.   In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorosurfactants and the products that contain fluorosurfactants.

d.   Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business at 1007 Market Street Wilmington, Delaware, 19899. Chemours FC is registered to do business in Florida.

e.   Defendant DuPont de Nemours, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805.  Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was

subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont"). New DuPont is registered to do business in Florida.

f.    Defendant E. I. du Pont de Nemours and Company ("Old DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old DuPont has done business throughout the United States, including conducting business in Florida. Old DuPont has been involved in the production and sale of fluorochemical intermediaries for use in AFFF manufacturing since the 1950s. When 3M left the market, Old DuPont took on a larger role in the AFFF market. Old DuPont has also manufactured, distributed, and sold Fluorochemical Products and raw PFAS around the country pursuant to a nationwide marketing campaign.

g.    Defendant Corteva, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont. Corteva, Inc. is registered to do business in Florida.

h.    Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, Chemguard has conducted and/or availed itself of doing business throughout the United States, including in Florida. Chemguard acquired Williams Fire and Hazard Control, Inc. ("WFHC"). Upon

18

information and belief, WFHC has and continues to sell and/or distribute AFFF throughout the United States, including in the State of Florida.

i.    Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

j.    Defendant National Foam National Foam, Inc., ("National Foam") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Florida. National Foam has its principal place of business in West Chester, Pennsylvania. National Foam developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Florida.

k.    Defendant Carrier Global Corporation is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Global Corporation is registered to do business in Florida.

l.    Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 870 Winter Street, Waltham, Massachusetts 02451. Raytheon Tech f/k/a United Tech is registered to do business in Florida.

m.   Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina

28086. Upon information or belief, Buckeye has conducted and/or availed itself of doing business throughout the United States, including in Florida.

n.  Defendant Arkema, Inc. is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema, Inc. is registered to do business in Florida.

o.  Defendant BASF Corporation is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF Corporation acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals. BASF Corporation is registered to do business in Florida. Upon information and belief, Ciba-Geigy Corporation and/or Ciba Specialty Chemicals conducted and/or availed itself of doing business throughout the United States, including in Florida.

p.  Defendant ChemDesign Products, Inc. is a Delaware corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, ChemDesign Products, Inc. has conducted and/or availed itself of doing business throughout the United States, including in Florida.

q.  Defendant Clariant Corporation is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Clariant is registered to do business in Florida.

r.  Defendant Chemicals Incorporated is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521. Upon information and belief, Chemicals Incorporated has conducted and/or availed itself of doing business throughout the United States, including in Florida.

s.      Defendant Nation Ford Chemical Company is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715. Upon information and belief, Nation Ford Chemical Company has conducted and/or availed itself of doing business throughout the United States, including in Florida.

t.      Defendant AGC Chemicals Americas, Inc. ("AGCCA") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341.  Upon information and belief, AGCCA is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd. Upon information and belief, AGCCA has conducted and/or availed itself of doing business throughout the United States, including in Florida.

u.      Defendant Deepwater Chemicals, Inc. is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801. Upon information and belief, Deepwater Chemicals, Inc. has conducted and/or availed itself of doing business throughout the United States, including Florida.

v.      Defendant Dynax Corporation is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, Dynax Corporation has conducted and/or availed itself of doing business throughout the United States, including in Florida.

w.      Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173. Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable

21

and wheeled extinguishers for commercial and industrial applications. In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF in Europe. On information and belief, beginning in 2011, Amerex designed, manufactured, marketed distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

x.      Defendant Archroma U.S., Inc. is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC. Upon information and belief, Archroma U.S., Inc. has conducted and/or availed itself of doing business throughout the United States, including in Florida.

y.      Defendant Mine Safety Appliances Co., L.L.C. ("MSA") is a Pennsylvania corporation and does business throughout the United States. MSA has its principal place of business at 1000 Cranberry Woods Drive, Cranberry Township, Pennsylvania, 16066. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS.

z.      Upon information and belief, Defendants John Doe 1-49 were designers, manufacturers, marketers, distributors, and/or sellers of Fluorosurfactant Products that have and continue to cause injury to Plaintiffs. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiffs will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

45.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of

the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

46.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

47.     The term "AFFF Defendant" or "AFFF Defendants" refers to all Defendants named herein who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint unless otherwise stated.

## FACTUAL ALLEGATIONS

**a.  PFAS threat to environment and human health the toxicity of AFFF Products and PFAS.**

48.     PFAS are chemical compounds containing fluorine and carbon. PFAS are a class of thousands of chemicals that include carbon chains containing at least one carbon atom on which some or all hydrogen atoms are replaced by fluorine atoms. All PFAS chemicals are entirely manmade and do not occur in nature.

49.     The two most widely studied types of these substances are PFOA and PFOS.

50.     PFAS have been dubbed "forever chemicals" because they do not readily break down in the environment. The carbon-fluorine bond in PFAS is one of the strongest bonds in chemistry. As a result, PFAS are thermally, chemically, and biologically stable.

51.     These forever chemicals are also highly mobile. Once these forever chemicals are introduced, they migrate through the surrounding environment through surface water, soil, and

groundwater. In short, once introduced in one area, PFAS are likely to contaminate a large area of natural resources and are difficult and costly to remove.

52.     PFAS is also bio accumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain.

53.     Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

54.     PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

55.     PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

56.     The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

57.     PFAS, as a whole, are highly noxious chemicals that have been associated with several adverse health outcomes in relevant scientific literature. According to the United States Environmental Protection Agency ("EPA"), "…studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g.,

testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects, and other effects (*e.g.*, cholesterol changes)."[3]

58.     PFOA and PFOS are highly water soluble, increasing the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water. Their mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.[4]

**FOAM**

59.     AFFF is a type of water-based foam that was first developed in the 1960s to extinguish hydrocarbon fuel-based fires.

60.     AFFF is a Class B foam; to use Class B foam, a Class B foam concentrate must first be mixed with water.

61.     AFFF is one of the primary tools used by firefighters for suppression of fires and is particularly effective for extinguishing fires involving oil and/or chemicals common in transportation accidents, aircraft accidents, and chemical spills.  Class B foam is also used in structural or other types of non-chemical fires when water cannot penetrate deeply enough to ensure that unseen fire is extinguished.  The most common non-military Class B foam is aqueous film-forming foam ("AFFF").  AFFF and other Class B foams contain PFAS.

---

[3] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[4] *See* EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16; and Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16, both available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

62.     Beginning in the 1960s, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing either PFOS, PFOA, or the chemical precursors that degrade into PFOS and PFOA.

63.     Class B foam concentrate is typically sold in five-gallon containers that firefighters are responsible for storing on the fire engine and/or pouring into the foam bladder of the fire engine. To mix the foam concentrate and water from a fire engine that is not pre-plumbed for foam, an educator must be placed in the foam concentrate to draw up the concentrate and mix it with water to create a thick, foamy substance. Firefighters are responsible for this process of preparing the foam, applying the foam, and for cleaning the equipment (hoses, nozzles, etc.) after use.

64.     The process of preparing and applying Class B foam, applying the foam, and then cleaning the equipment after foam use causes exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact). The Class B foam containers used by individuals and their fire departments to mix and prepare the Class B foam for use did not say that the foam contains PFAS and did not warn individuals of the serious health risks associated with exposure to PFAS.

65.     Class B foam is used in fire extinguishment in a manner typical of routine methods of fire extinguishment—by being sprayed through a fire hose, appliance, or nozzle.

66.     The techniques used for "laying a blanket" of Class B foam in fire extinguishment include banking the foam off a wall or vertical surface to agitate the foam before it covers the fire; or applying it to the ground surface where the fire is burning. In structure fires, it can also be necessary to spray the ceilings, walls and floors. Reapplication of foam is often necessary because the foam blanket will break down over a short time.

67.     These techniques are used routinely in firefighting training as well as in real-world fire extinguishment, and result in firefighters being sprayed or entirely soaked with Class B foam,

walking in and through Class B foam (which can reach thigh- or even waist-high), or kneeling in Class B foam during use. As a result, the techniques cause exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact).

## DEFENDANTS' FLUOROSURFACTANT PRODUCTS

68.     PFAS are used to make a variety of consumer and industrial goods sold, supplied, used, and disposed of, including but not limited to nonstick cookware, waterproofing waxes, stain-preventing coatings, turnout gear used by firefighters, and AFFF.

69.     AFFF is a type of water-based foam that was first developed in the 1960s the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing either PFOS, PFOA, or the chemical precursors that degrade into PFOS and PFOA.

70.     AFFF can be made without the fluorosurfactants that contain PFOA, PFOS, and/or their precursor chemicals. Fluorine-free firefighting foams, for instance, do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

71.     The Fluorosurfactant Products designed, manufactured, marketed, distributed, and/or sold by Defendants contained PFOA, PFOS, and/or their chemical precursors.

## DEFENDANTS' AFFF

72.     Aqueous Film-Forming Foam ("AFFF") is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires. It is used to extinguish fires that are difficult to fight, particularly fires that involve petroleum or other flammable liquids. AFFF works by coating the ignited fuel source, preventing its contact with oxygen and suppressing combustion. AFFF is typically sprayed directly onto a fire.

73.     The AFFF products made by AFFF Defendants contained either or both PFOA and PFOS.

74.     The AFFF produced, marketed and/or sold by 3M was the only AFFF produced from fluorochemicals manufactured through electrochemical fluorination ("ECF"), a process that generates PFOS.

75.     Upon information and belief, from 1960s through the mid-2000s, 3M manufactured, designed, marketed, distributed, and sold AFFF containing PFOS, PFOA, and/or their chemical precursors within the United States and raw materials containing PFOA and/or its chemical precursors for use in the production of AFFF within the United States.

76.     Upon information and belief, the other AFFF Defendants used telomerization to produce AFFF; fluorochemicals made through telomerization degrade and/or contain PFOA but not PFOS.

77.     AFFF Defendants designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold, and/or otherwise handled AFFF containing toxic PFAS, or underlying PFAS containing chemicals used in AFFF production, that were used by entities around the country, including military, county, and municipal firefighting departments.

78.     AFFF Defendants have each designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS, in such a way as to cause the contamination of Plaintiffs' blood and/or body with PFAS, and the resultant bio-persistence and bio-accumulation of such PFAS in the blood and/or body of Plaintiffs.

79.     When used as the Defendants intended and directed, AFFF causes PFOA, PFOS, and/or other PFAS compounds to enter the body of those handling, using, or otherwise exposed to the foam (including firefighters). When using Defendants' AFFF, firefighters absorb PFAS, including PFOA and PFOS, through their skin, inhale PFAS, and/or inadvertently ingest PFAS.

80.     PFOA and PFOS bio-accumulate in the human body and can cause serious injuries.

81.     AFFF can be made without PFOA and PFOS. Unlike AFFF made with PFOA or PFOS, fluorine-free foams do not pose a significant health threat to firefighters.

### AFFF'S HAZARDOUS EFFECTS

82.     AFFF and its components are associated with a wide variety of adverse health effects. Exposure to Defendants' AFFF products has been linked to serious medical conditions including, but not limited to, kidney cancer, testicular cancer, liver cancer, pancreatic cancer, prostate cancer, breast cancer, colon cancer, ovarian cancer, lymphoma, thyroid disease, thyroid diseases, kidney disease, ulcerative colitis, infertility, and pregnancy induced hypertension.

83.     By at least the end of the 1960s, animal toxicity testing performed by some Defendants manufacturing and/or using PFAS indicated that exposure to such materials, including at least PFOA, resulted in various adverse health effects among multiple species of laboratory animals, including toxic effects to the liver, testes, adrenals, and other organs and bodily systems.

84.     On information and belief, 3M and DuPont concealed from the public and government agencies its knowledge of the threats to public health and the environment posed by PFOA and PFOS.

85.     Some or all of the Defendants understood how stable the fluorinated surfactants used in AFFF are when released into the environment from their first sale to a customer, yet they failed to warn their customers or provide reasonable instruction on how to manage wastes generated from their products.

86.     During the same time period, additional research and testing performed by some Defendants manufacturing and/or using PFAS indicated that such materials, including but not limited to PFOA, owing to their unique chemical structure, were resistant to environmental degradation and would persist in the environment 'forever' unaltered if released.

87.     By at least the end of the 1970s, additional research and testing performed by some Defendants manufacturing and/or using PFAS indicated that one or more such materials, including but not limited to PFOA and PFOS, because of their unique chemical structure, would bind to proteins in the blood of animals and humans exposed to such materials where such materials would remain and persist over long periods of time and would accumulate in the blood/body of the exposed individuals with each additional exposure.

88.     By at least the end of the 1980s, additional research and testing performed by some Defendants manufacturing and/or using PFAS indicated that at least one such PFAS, PFOA, had caused Leydig cell (testicular) tumors in a chronic cancer study in rats, resulting in at least one such Defendant, DuPont, classifying such PFAS internally as a confirmed animal carcinogen and possible human carcinogen.

89.     It was understood by AFFF Defendants by at least the end of the 1980s that a chemical that caused cancer in animal studies must be presumed to present a cancer risk to humans, unless the precise mechanism of action by which the tumors were caused was known and was known not to occur in humans.

90.     By at least the end of the 1980s, scientists had not determined the precise mechanism of action by which any PFAS caused tumors. Therefore, scientific principles of carcinogenesis classification mandated AFFF Defendants presume any such PFAS material that caused tumors in animal studies could present a potential cancer risk to exposed humans.

91.     During the same time period, additional research and testing performed by some Defendants manufacturing and/or using PFAS, including at least DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including but not

limited to PFOA. These data were not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

92.     Some Defendants, including at least 3M and DuPont, understood that, not only did PFAS, including, but not limited to, PFOA and PFOS, enter into, persist and accumulate in human blood and in the human body; but that once in the human body and blood, PFAS have a long half-life, particularly the longer-chain PFAS, such as PFOS and PFOA. As a result, increasing levels of PFAS chemicals were allowed to build up and accumulate in the blood and/or body of exposed individuals over time, particularly in cases of continuous or repeated PFAS exposure.

93.     By at least the end of the 1990s, additional research and testing performed by some Defendants manufacturing and/or using PFAS, including at least 3M and DuPont, indicated that at least one such PFAS, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver, and pancreatic) in a second chronic cancer study in rats.

94.     By at least the end of the 1990s, the precise mechanism(s) of action by which any PFAS caused each of the tumors found in animal studies had still not been identified, mandating that AFFF Defendants continue to presume that any such PFAS that caused such tumors in animal studies could present a potential cancer risk to exposed humans.

95.     By at least 2010, additional research and testing performed by some Defendants manufacturing and/or using PFAS, including at least 3M and DuPont, revealed multiple potential adverse health impacts among workers exposed to such PFAS, including but not limited to PFOA. The adverse health impacts included increased cancer incidences, hormone changes, lipid changes, thyroid, and liver impacts.

96.     When the United States Environmental Protection Agency ("USEPA") and other state and local public health agencies and officials first began learning of PFAS exposure in the United States and potential associated adverse health effects, AFFF Defendants repeatedly assured

and represented to such entities and the public that such exposure presented no risk of harm and were of no significance.

97.     After the USEPA and other entities began asking Defendants to stop manufacturing and/or using certain PFAS, AFFF Defendants began manufacturing and/or using and/or began making and/or using more of certain other and/or "new" PFAS, including PFAS materials with six or fewer carbons, such as GenX (collectively "Short-Chain PFAS").

98.     AFFF Defendants manufacturing and/or using Short-Chain PFAS, including at least DuPont and 3M, are aware that one or more such Short-Chain PFAS materials have been found in human blood.

99.     By at least the mid-2010s, AFFF Defendants, including at least DuPont and Chemours, were aware that at least one Short-Chain PFAS had been found to cause the same triad of tumors (Leydig (testicular), liver, and pancreatic) in a chronic rat cancer study as had been found in a chronic rat cancer study with a non-Short-Chain PFAS.

100.    Research and testing performed by and/or on behalf of AFFF Defendants making and/or using Short-Chain PFAS indicates that such Short-Chain PFAS materials present the same, similar, and/or additional risks to human health as had been found in research on other PFAS materials, including cancer risk.

101.    Nevertheless, AFFF Defendants repeatedly assured and represented to governmental entities and the public (and continue to do so) that the presence of PFAS, including Short-Chain PFAS, in human blood at the levels found within the United States present no risk of harm and are of no legal, toxicological, or medical significance of any kind.

102.    At all relevant times, AFFF Defendants, individually and/or collectively, have intentionally, purposefully, recklessly, and/or negligently chosen not to fund or sponsor any study, investigation, testing, and/or other research of any kind of the nature that AFFF Defendants claim

is necessary to confirm and/or prove that the presence of any one and/or combination of PFAS in human blood causes any disease and/or adverse health impact of any kind in humans, presents any risk of harm to humans, and/or is of any legal, toxicological, or medical significance to humans, according to standards AFFF Defendants deem acceptable despite possessing more than ample resources and the ability to have done so.

103.    Even after an independent science panel, known as the "C8 Science Panel," publicly announced in the 2010s that human exposure to 0.05 parts per billion or more of one PFAS, PFOA, had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, AFFF Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFAS in human blood at the levels found within the United States presents no risk of harm and are of no legal, toxicological, or medical significance of any kind, and have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate.

104.    At all relevant times, AFFF Defendants shared and/or should have shared among themselves all relevant information relating to the presence, bio-persistence, and bio-accumulation of PFAS in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

105.    As of the present date, blood serum testing and analysis by AFFF Defendants, independent scientific researchers, and/or government entities has confirmed that PFAS materials are clinically, demonstrably present in approximately 99% of the current population of the United States.

106.    There is no naturally occurring "background," normal, and/or acceptable level or rate of any PFAS in human blood. All PFAS detected and/or present in human blood are present and/or detectable in such blood as a direct and proximate result of the acts and/or omissions of Defendants.

107.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiffs from discovering the existence and extent of any injuries/harm as alleged herein.

108.    At all relevant times, Defendants, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any potential adverse health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with the presence of PFAS in human blood.

109.    At all relevant times, Defendants, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would have properly and fully alerted Plaintiffs to the legal, toxicological, medical, or other significance and/or risk from having any PFAS material in Plaintiffs' blood.

110.    At all relevant times, Defendants encouraged the continued and even further increased use of PFAS by their customers and others, including but not limited to the manufacture, use, and release, of AFFF containing PFAS and/or emergency responder protection gear or equipment coated with materials made with or containing PFAS, and tried to encourage and foster the increased and further use of PFAS in connection with as many products/uses/and applications

as possible, despite knowledge of the toxicity, persistence, and bio-accumulation concerns associated with such activities.

111.    To this day, Defendants deny that the presence of any PFAS in human blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance.

112.    To this day, Defendants deny that any scientific study, research, testing, or other work of any kind has been performed that is sufficient to suggest to the public that the presence of any PFAS material in human blood, at any level, is of any legal, toxicological, medical, or other significance.

113.    Defendants, to this day, affirmatively assert and represent to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States causes any health impacts or is sufficient to generate an increased risk of future disease sufficient to warrant diagnostic medical testing, often referring to existing studies or data as including too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions.

114.    Even though Defendants continue to deny the harmful environmental effects and health impacts from PFAS, on April 8, 2024, the EPA promulgated individual Maximum Contaminant Levels (MCLs) under the Safe Drinking Water Act (SDWA) for PFOA and PFOS at 4.0 nanograms per liter (ng/L) or parts per trillion (ppt), the current lowest detection level under the current detection methodologies. The EPA also set a health-based goal of zero for PFOA and PFOS; reflecting that there is no safe level of exposure to these contaminants.

115.    The EPA also promulgated individual MCLs for PFHxS, PFNA, and HFPO-DA at 10 ng/L. In addition to the individual MCLs for PFHxS, PFNA, and HFPO-DA, in consideration of the known toxic effects, dose additive health concerns and occurrence and likely co-occurrence

in drinking water of these three PFAS, as well as PFBS, the EPA is finalizing a Hazard Index (HI) of 1 (unitless) as the MCL for any mixture containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS.

116.    The EPA issued this rule having reviewed extensive research and science on how PFAS affects public health, engaging with the water sector and state regulators, and also considered 120,000 comments on the proposed rule prior to promulgating its final rule.

117.    Defendants were and/or should have been aware, knew and/or should have known, and/or foresaw or should have foreseen that their design, marketing, development, manufacture, distribution, release, training and response of users, production of instructional materials, sale and/or other handling and/or use of AFFF containing PFAS would result in the contamination of the blood and/or body of Plaintiffs with PFAS, and the bio-persistence and bio-accumulation of such PFAS in their blood and/or body.

118.    Defendants were and /or should have been aware, or knew and/or should have known, and/or foresaw or should have foreseen that allowing PFAS to contaminate the blood and/or body of Plaintiffs would cause injury, irreparable harm, and/or unacceptable risk of such injury and/or irreparable harm to Plaintiffs.

119.    Defendants did not seek or obtain permission or consent from Plaintiffs before engaging in such acts and/or omissions that caused, allowed, and/or otherwise resulted in Plaintiffs' exposure to AFFF and the contamination of Plaintiffs' blood and/or body with PFAS materials, and resulting bio-persistence and bio-accumulation of such PFAS in their blood and/or body.

**AFFF Defendants' History of Manufacturing and Selling AFFF**

120.    3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s.

121.    Buckeye began to manufacture, market, and sell AFFF in the 2000s.

36

122.    In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF. 3M, in its press release announcing the phase out, stated "our products are safe," and that 3M's decision was "based on [its] principles of responsible environment management." 3M further stated that "the presence of these materials at [] very low levels does not pose a human health or environmental risk." In communications with the EPA at that time, 3M also stated that it had "concluded that…other business opportunities were more deserving of the company's energies and attention…"

123.    Following 3M's exit from the AFFF market, the remaining AFFF Defendants continued to manufacture and sell AFFF that contained PFAS and/or PFAS precursors.

124.    AFFF Defendants knew their customers warehoused large stockpiles of AFFF. In fact, AFFF Defendants marketed their AFFF products by touting their long shelf-life. Long after AFFF Defendants fully understood the toxicity of PFAS, and their impacts to the health of humans following exposure, AFFF Defendants continued to and did conceal the true, harmful nature of PFAS.

125.    While AFFF Defendants phased out production or transitioned to other formulas, they did not instruct their customers that they should not use AFFF that contained PFAS, and/or their precursors, or in any way warn their customers that their AFFF products were harmful.

126.    Further, AFFF Defendants did not act to get their harmful AFFF products off the market.

127.    AFFF Defendants did not warn public entities, firefighter trainees who they knew could, would, and did foreseeably come into contact with their AFFF products, and/or firefighters employed by either civilian and/or military employers that use of and/or exposure to AFFF Defendants' products containing PFAS and/or its precursors posed a danger to human health.

128.     The Plaintiffs directly used, were exposed to, and/or were given AFFF with which to fight fires on a regular basis.

129.     The Plaintiffs were never informed that this product was inherently dangerous. Nor were the Plaintiffs warned about the known health risks associated with this product.

130.     The Plaintiffs never received nor were told to use any protective gear to guard against the known dangerous propensities of this product.

131.     AFFF Defendants have known of the health hazards associated with AFFF and/or its compounds for decades and that their intended and/or common use would and did harm human health.

132.     Information and data regarding AFFF and its compounds were readily accessible to each of the above-referenced AFFF Defendants for decades. Each is an expert in the field of AFFF manufacturing and/or the materials needed to manufacture AFFF; each has detailed information and understanding about the chemical compounds that form AFFF products.

133.     The AFFF Defendants' manufacture, distribution, and/or sale of AFFF resulted in the Plaintiffs and other individuals who came in contact with the chemical to be harmed and suffer injury.

134.     The AFFF Defendants through their manufacturing, distribution and/or sale of AFFF, and through their involvement, and/or participation in the creation of training and instructional materials and activities, knew, foresaw, and/or should have known, and/or foreseen that the Plaintiffs and those similarly situated would be harmed.

135.     The AFFF Defendants' products were unreasonably dangerous, and the Defendants failed to warn of this danger.

136.     Defendants have been manufacturing and/or using PFAS chemicals since the 1940s and continued to do so undeterred even after becoming aware of the harmful effects of these chemicals to humans and the environment.

137.     For most of the past seven decades through the early 2000s, 3M was the primary manufacturer of PFAS in the United States.

138.     3M went on to market and promoted PFAS, and shipped PFAS to manufacturers, including Old DuPont, throughout the United States, including Michigan. 3M made enormous profits from PFAS and products containing PFAS and shipped PFAS and products containing PFAS to the United States Air Force, including its Air Force Bases and military installations throughout the country for decades until announcing in 2000 that it would cease production of PFOA and PFOS.

**AFFF Containing PFOS And PFOA Is Fungible and Commingled In The Groundwater**

139.     AFFF containing PFOS and/or PFOA, once it has been released to the environment, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF or chemical feedstock.

140.     A subsurface plume, even if it comes from a single location, such as a retention pond or fire training area, originates from mixed batches of AFFF and chemical feedstock coming from different manufacturers.

141.     Because precise identification of the specific manufacturer of any given AFFF/Component Product that was a source of the PFAS found at any of the aforementioned Air Force Bases during fire protection, training, and response activities, resulting in widespread PFAS contamination is nearly impossible, given certain exceptions, Plaintiffs must pursue all Defendants, jointly and severally.

142.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF/Component Products containing PFOS and PFOA, at Plaintiffs' expense, and to attempt to avoid liability.

**3M'S KNOWLEDGE AND FRAUDULENT COVER-UP OF THE DANGERS OF PFAS**

143.    In the 1950s, based on its own internal studies, 3M concluded that PFAS are "toxic."

144.    3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals.[5]

145.    By the early 1960s, 3M understood that some PFAS are highly persistent in the environment, meaning that they do not degrade.

146.    3M knew as early as 1960 that chemical waste from its PFAS manufacturing facilities that was dumped into landfills or spilled on natural surfaces would leach into groundwater and otherwise enter the environment. A 3M internal memo from 1960 described the company's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."[6]

147.    As early as 1963, 3M was aware that its PFAS products were persistent in the environment and would not degrade after disposal.

148.    3M began monitoring the blood of its employees for PFAS, as early as 1976, because 3M was concerned about the health effects of PFAS. The studies revealed that some 3M

---

[5] *See* Exhibit 1009, Plaintiff's Second Amended Exhibit List, State of Minnesota v. 3M Co., Case. No. 27-cv-10-28862, Index #1057 (Minn. D. Ct. Feb. 14, 2018), available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1009.pdf

[6] *See* Exhibit 1025 at 2, Plaintiff's Second Amended Exhibit List, State of Minnesota v. 3M Co., Case. No. 27-cv-10-28862,   Index   #1057   (Minn.   D.   Ct.   Feb.   14,   2018),   available   at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1025.pdf

personnel were exposed to fluorochemicals between 100 and 300 times the normal levels in their blood.

149.    3M documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

150.    By at least 1970, 3M knew that its PFAS products were hazardous to marine life.

151.    One study of 3M's PFAS around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

152.    In 1975, 3M found there was a "universal presence" of at least one form of PFAS in blood serum samples taken from across the United States.[7]

153.    Because PFAS are not naturally occurring in any amount, anywhere on the planet, this finding unquestionably alerted 3M to the near inevitability that its products were a pathway for widespread public exposure to its toxic ingredient—a likelihood that 3M considered internally but did not share outside the company.

154.    This finding also alerted 3M to the likelihood that this PFAS is mobile, persistent, bio-accumulative, and biomagnifying, as those characteristics would explain the ubiquitous presence of this PFAS from 3M's products in human blood.

155.    According to a deposition transcript in a lawsuit brought by the State of Minnesota against 3M [No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)] ("Minn. Lawsuit") for damages to the state's natural resources from PFAS, 3M began monitoring the blood of its employees for PFAS as early as 1976, because the company was "concerned" about "health" effects of PFAS. 3M documents from 1977 relating to these worker tests further confirmed that PFAS bioaccumulate.

---

[7] Technical Report Summary: re Absorption of FC 95 and FC 143 on Soil, Feb. 27, 1978, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf.

156.    Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys. Also in 1978, a group of scientists and doctors met to review the results of various studies as part of the Fluorochemicals in Blood program. At the meeting, Dr. Harold C. Hodge told 3M's then medical director, Dr. F.A. Ubel, that employees' physical examination results should be analyzed in the context of the general population. Specifically, Dr. Hodge stated that "[t]here appears to be indications of liver change from the physical examination results."35[8]

157.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota.

158.    A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and PFAS bioaccumulating in fish tissue taken from the Tennessee River. 3M resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.

159.    3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

160.    In 1983, 3M scientists opined that those concerns about PFAS give rise to legitimate questions about the persistence, accumulation potential, and ecotoxic of [PFAS] in the environment.[9]

161.    In 1984, 3M's internal analyses demonstrated that PFAS were likely bioaccumulating in 3M fluorochemical employees.[10]

---

[8] 3M Interoffice Correspondence re: Meeting Minutes – Meeting with H.C. Hodge, June 7, 1979, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2724.pdf.

[9] Memorandum from R.G. Perkins to F.D. Griffith re: Summary of the Review of the FC-143 Two-Year Feeder Study Report to be presented at the January 7, 1988, meeting with DuPont, January 5, 1988, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1343.pdf.

[10] Memorandum from D.E. Roach to P.F. Riehle re: Organic Fluorine Levels, Aug. 31, 1984, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf.

162.    According to the Minnesota Attorney General, despite 3M's understanding of the risks associated with PFAS, 3M engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

163.    According to a deposition transcript from the Minn. Lawsuit, 3M recognized that if the public and governmental regulators became aware of the risks associated with PFAS, 3M would be forced to halt its manufacturing of PFAS and PFAS-derived products which would result in the loss of hundreds of millions of dollars in annual revenue.[11]

164.    The potential loss of 3M's massive profits from PFAS drove 3M to engage in a campaign to influence the science relating to PFAS and, according to internal 3M documents to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

165.    A key priority of an internal 3M committee—referred to as the FC CoreTeam—was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

166.    In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS and sought control over when and whether the results of scientific studies were published at all.

167.    A significant aspect of 3M's campaign to influence independent scientific research involved 3M's relationship with Professor John Giesy. 3M provided millions of dollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in

---

[11] *See* Exhibits 2144 & 2204, Plaintiff's Second Amended Exhibit List, State of Minnesota v. 3M Co., Case. No. 27-cv-10-28862, Index #1057 (Minn. D. Ct. Feb. 14, 2018), available at https://www.ag.state.mn.us/Office/Cases/3M/StatesExhibits.asp.

his deposition transcript in the Minn. Lawsuit, he privately characterized himself as part of the 3M "team."

168.   According to Professor Giesy's deposition transcript in the Minn. Lawsuit, Professor Giesy worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering a "quid pro quo" with the scientists.39[12]

169.   According to emails produced by Professor Giesy in the Minn. Lawsuit, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles and, in performing reviews of these articles, Professor Giesy stated that he was always careful to ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."[13]

170.    3M's own employees recognized that 3M was concealing known dangers relating to PFAS. For example, in a 1999 resignation letter, an employee stated, "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me, it is unethical to be concerned with markets, legal defensibility, and image over environmental safety."41[14]

171.   In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOA products in 2000.

---

[12] *See Id.* at Exhibit 1740 https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1740.pdf.
[13] *Id.*
[14] *See id.* at Exhibit 1001, available at
https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf.

172.     On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.[15]

173.     On the same day as 3M's phase-out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."[16]

174.     In a memo explaining its decision, the EPA noted that PFOS was among certain chemicals that appear to be persistent, bio-accumulative and toxic.[17]

175.     3M knew or should have known that through their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment at the locations Plaintiffs were exposed.

## OLD DUPONT'S KNOWLEDGE AND FRAUDULENT COVER-UP OF THE DANGERS OF PFAS AND MOUNTING LIABILITIES

176.     Beginning in the 1950s, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at several facilities in the United States.

---

[15] *See id.* at Exhibit 1690, available at
https://www.ag.state.mn.us/Office/Cases/3M/StatesExhibits.asp

[16] EPA, EPA and 3M Announce Phase Out of PFOS, (May 16, 2000), https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005246b4.html

[17] *Id.* Also, the California State Water Resources Control Board has concluded that, major sources of PFAS" include industrial sites, landfills, and wastewater treatment plants. It elaborates: "PFAS can get into drinking water when products containing them are used or spilled onto the ground or into lakes and rivers. Once in groundwater, PFAS are easily transported large distances and can contaminate drinking wells." See California Water Board, Per- and Polyfluoroalkyl Substances (PFAS) Background, https://www.waterboards.ca.gov/pfas/background.html.

177.     Throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bio-accumulative, and bio-persistent in the environment. Old DuPont also knew that it directly emitted and discharged, and continued to emit and discharge, PFOA in large quantities into the environment from its manufacturing plants, such that hundreds of thousands of people had been exposed to its PFOA, including through public and private drinking water supplies.

178.     Old DuPont company scientists issued internal warnings about the toxins associated with their PFAS products as early as 1961.

179.     Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

180.     In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFAS, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects could be attributed to PFAS exposure.

181.     This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of organic fluorine.

182.     By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

183.     Old DuPont did not report this data or the results of its worker health analysis to any government agency or community.

184.     The following year, Old DuPont internally confirmed that PFOA "is toxic," that humans bioaccumulate PFOA in their tissue, and that "continued exposure is not tolerable."

185.     Not only did Old DuPont know that PFOA bioaccumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

186.     In fact, Old DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of internal studies of its own plant workers confirming placental transfer of PFOA in humans.

187.     While Old DuPont knew about this toxic danger as early as the 1960s, Old DuPont also was aware that PFAS could contaminate the surrounding environment and cause human exposure.

188.     In 1981, Old Dupont tested for and found PFOA in the blood of female plant workers Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defects.[18]

189.     In 1981, Old DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries and enter the environment and natural resources.

190.     By 1984, Old DuPont unquestionably was aware that PFOA is biopersistent. Old DuPont was long aware that the PFOA it was releasing from its facilities was leaching into groundwater used for public drinking water.

191.     After obtaining data on these releases and the resulting contamination near Old DuPont's Washington Works plant in West Virginia in 1984, Old DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

---

[18] DuPont, C-8 Blood Sampling Results, 1981. (xnpw0228). DuPont. C-8 blood sampling results; 1981. (xnpw0228). https://www.industrydocuments.ucsf.edu/docs/#id=xnpw0228.

192.     Old DuPont employees who attended the 1984 Meeting discussed available technologies that could control and reduce PFOA releases from its manufacturing facilities, as well as potential replacement materials.

193.     Old DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

194.     During the 1984 Meeting, Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."[19]

195.     They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation."[20]

196.     They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these departments had "no incentive to take any other position."[21]

197.     By 2000, Old DuPont's in-house counsel was particularly concerned about the threat of punitive damages resulting from Old DuPont's releases of PFOA at its Washington Works facility in West Virginia.

198.     Old DuPont's own Epidemiology Review Board repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

199.     For example, in February 2006, the Epidemiology Review Board "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and

---

[19] Schmid, J.A., Personal & Confidential Memorandum, re: C-8 Meeting Summary (May 23, 1984), Wilmington, Del., available at https://static.ewg.org/files/dupont_elim_PFOA_1984.pdf (last accessed August 3, 2023) (hereinafter "The DuPont Memo").
[20] *See id.*
[21] *See id.*

questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."[22]

200.    In 2004, EPA filed an action against Old DuPont based on its failure to disclose toxic and exposure information for PFOA, in violation of federal environmental laws.

201.    In 2005, Old DuPont eventually settled the action by agreeing to pay $10.25 million in a civil administrative penalty and to complete $6.25 million in supplemental environmental projects.

202.    The combined settlement resolved eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS compounds.

203.    Old DuPont also promised to phase out the production and use of PFOA by 2015.

204.    EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."[23]

205.    Old DuPont and Chemours knew or should have known that in their intended and/or common use products containing PFAS would very likely injure and/or threaten public health and the environment in Michigan.

206.    Also, in 2005, a final court order was entered approving Old DuPont's 2004 settlement in the class action lawsuit styled Leach, et al. v. E. I. du Pont de Nemours & Co., Civil Action No. 01-C-608 (Wood Cty. W. Va. Cir. Ct.) (the "Leach Action") filed on behalf of

---

[22] Tom L. Beauchamp, et al., Memorandum to Michael Kaplan re: Epidemiology Review Board and PFOA (February 24, 2006), available at https://static.ewg.org/files/ERB_February2006.pdf (last accessed August 3, 2023).
[23] Dave Ryan, EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History, EPA Newsroom (Dec. 14, 2005), https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/fdcb2f665 cac66bb852570d7005d6665.html

approximately 70,000 individuals with PFOA-contaminated drinking water supplies in Ohio and West Virginia for benefits valued at over $300 million.

207.    Under the terms of the final class action settlement, Old DuPont agreed to fund a panel of independent scientists (the "C8 Science Panel") to conduct whatever studies were necessary to confirm which diseases were linked to class member PFOA exposure, to remove PFOA from the contaminated water sources, and to pay up to $235 million for medical monitoring of class members with respect to any diseases linked by the C8 Science Panel to their PFOA exposure. "C-8," a term used internally by DuPont employees, is an alternative name for PFOA.

208.    After seven years of study and analyses, the C8 Science Panel confirmed that PFOA exposures among class members were linked to six serious human diseases, including two types of cancer.

209.    On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFOS and PFOA.[24]

210.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, and limits on the manufacture and handling of any PFOA containing product, and to develop safe nonfluorinated alternatives to these products to avoid long-term harm to human health and the environment.[25]

---

[24] *See* Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems, 77 Fed. Reg: 26072 (May 2, 2012).

[25] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly and perfluoroalkyl substances (PFASs). Environ Health Perspective 123: A107–A111, available at http://dx.doi.org/10.1289/ehp.1509934.

211.     On May 25, 2016, the EPA released a lifetime health advisory ("HA") and health effects support documents for PFOS and PFOA.[26] The EPA developed the HA's to assist governmental officials in protecting public health when PFOS and PFOA are present in drinking water. The EPA HA's identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The HA's were based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and were also informed by epidemiological studies of human populations exposed to PFOS.

212.     In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFCs. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[27]

---

[26] *See* Fed. Register, Vol. 81, No. 101, May 25, 2016, Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate. According to EPA, "...studies indicate that exposure to PFOA and PFOS over certain levels may result in... developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."; see also EPA, Fact Sheet PFOA & PFOS Drinking Water Health Advisories, EPA Document Number 800-F-16-003, available at
https://www.epa.gov/sites/default/files/201606/documents/drinkingwaterhealthadvisories_pfoa_pfos_upd
ated_5.31.16.pdf (last visited, May 8, 2023).
[27] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate (Sept. 2016), at 1, 17, 19, available at https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf
Filed: New York County Clerk 03/13/2023 04:41 PM INDEX NO. 152370/2023 NYSCEF DOC. NO. 2
NYSC (last visited, Oct. 25, 2023).

213.     Old DuPont required that Chemours both directly assume its historical PFAS liabilities and indemnify Old DuPont from those liabilities. Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [C8] MDL could have a material adverse effect on Chemours' consolidated financial position, results of operations or liquidity."[28]

214.     On February 13, 2017, Old DuPont and Chemours agreed to pay $670.7 million to resolve the approximately 3,500 then-pending cases in the C8.

### OLD DUPONT'S MULTI-STEP, FRAUDULENT SCHEME TO ISOLATE ITS VALUABLE TANGIBLE ASSETS FROM PFAS LIABILITIES AND HINDER CREDITORS

215.     By 2013, Old DuPont knew that it faced substantial environmental and other liabilities arising from its use of PFOA at Washington Works alone, as well as liability related to PFAS contamination at other sites and areas throughout the country, and its sale of products containing PFAS, and that its liability was likely billions of dollars.

216.     These liabilities include clean-up costs, remediation obligations, tort damages, natural resource damages and, most importantly, likely massive and potentially crippling punitive damages arising from Old DuPont's intentional misconduct.

217.     Considering this significant exposure, upon information and belief, by 2013 Old DuPont's management began to consider restructuring the company to, among other things, avoid responsibility for the widespread environmental harm and personal injuries that Old DuPont's PFAS and associated conduct caused, and to shield billions of dollars in assets from these substantial liabilities. Old DuPont referred to this initiative internally as "Project Beta."

---

[28] *See* The Chemours Company, Form 10-K 2016 at 16, available at
https://d1lge852tjjqow.cloudfront.net/CIK-0001627223/fef1bcb1-b84c-46e49c3a54bef7943338.pdf

218.   Upon information and belief, Old DuPont contemplated various restructuring opportunities, including potential merger structures. In or about 2013, Old DuPont and The Chemical Company ("Old Dow") began discussions about a possible "merger of equals."

219.   Upon information and belief, Old DuPont recognized that neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS liabilities that Old DuPont faced.

220.   Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

221.   Old DuPont engaged in a three-part restructuring plan, further explained below.

222.   The first step in Old DuPont's plan was to transfer its Performance Chemicals business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) into its wholly owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun off" Chemours as a separate publicly traded entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

223.   Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities, and that Old DuPont still faced direct liability for its own conduct.

224.   Accordingly, Old DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades of illicit conduct regarding PFAS.

225.   The second step involved Old DuPont and Old Dow entering an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow with subsidiaries

of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

226.    Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

227.    The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont.

228.    The third step involved DowDuPont spinning off two, new, publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow") which currently holds Old Dow as a subsidiary. DowDuPont was then renamed New DuPont.

229.    As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion.

230.    New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

## THE CHEMOURS SPINOFF

231.    In February 2014, Old DuPont formed Chemours as a wholly-owned subsidiary. Chemours was originally incorporated on February 18, 2014, under the name "Performance Operations, LLC."

232.    On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

233.    Prior to July 1, 2015, Chemours was a wholly-owned subsidiary of Old DuPont. On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals Business, consisting of Old DuPont's Titanium Technologies, Chemical Solutions, and fluorochemical products segments, and Chemours became a separate, publicly traded entity.

234.    The Performance Chemicals Business included fluorochemical products and the business segment that had manufactured, used, and discharged PFOA into the environment.

235.    Prior to the Chemours Spinoff, Chemours was a wholly owned subsidiary of Old DuPont, and its Board of Directors had three members, all of whom were Old DuPont employees.

236.    On June 19, 2015, a fourth member of the Board was appointed, and upon information and belief, this fourth member had served as a member of Old DuPont's Board of Directors from 1998 to 2015.

237.    On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and to fill the vacancies created thereby, seven new members were appointed.

238.    To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015, Separation Agreement (the "Chemours Separation Agreement").

239.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including approximately 37 active chemical plants.

240.    Old DuPont completed a significant internal reorganization prior to the Chemours Spinoff, such that all the assets that Old DuPont deemed to be part of the Performance Chemicals Business would be transferred to Chemours.

241.    At the same time, Chemours accepted a broad assumption of liabilities for Old DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the nature, probable maximum loss value, and anticipated timing of the liabilities that Chemours assumed are not publicly available.

242.    Notwithstanding the billions of dollars in PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

243.    Thus, in total, Chemours distributed $3.9 billion to Old DuPont. Chemours funded these distributions by entering approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

244.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, and Old DuPont stripped Chemours's value for itself and its shareholders. In total, Chemours transferred almost $7 billion in stock, cash, and notes to Old DuPont and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours. Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

245.    In addition to the assumption of such liabilities, the Chemours Separation Agreement required Chemours to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

246.    The Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which is defined broadly to include,

among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities . . . ," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting PFOA into the environment.

247.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

248.    The Chemours Separation Agreement also required Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

249.    Chemours also agreed to use its best efforts to be fully substituted for Old DuPont concerning any order, decree, judgment, agreement, or action for Old DuPont's environmental liabilities.

250.    Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS liabilities were properly estimated and (ii) the Court does not limit Chemours' liability that the Chemours Separation

Agreement imposes, then Chemours would have been insolvent at the time of the Chemours Spinoff.

251.    There was no meaningful, arms-length negotiation of the Separation Agreement.

252.    In its Delaware lawsuit, Chemours alleges that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

253.    Although Chemours had a separate board of directors, Old DuPont employees controlled the Chemours board. Indeed, when the Chemours Separation Agreement was signed, Chemours was a wholly owned subsidiary of Old DuPont, and the Chemours board consisted of three Old DuPont employees and one former, long-standing member of the Old DuPont board.

254.    Chemours' independent board of directors, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff, did not participate in the negotiations of the terms of the separation.

255.    It is apparent that Old DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and in so doing, shield Old DuPont's assets from any financial exposure associated therewith.

256.    Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public

SEC filings that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

257.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion as of December 31, 2015, yielding a total net worth of $130 million.

258.    Removing Chemours' goodwill and other intangibles of $176 million yields a tangible net worth of negative $46 million (that is, Chemours' liabilities were greater than its tangible assets). According to unaudited pro forma financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Chemours Spinoff), Chemours had total assets of $6.4 billion and total liabilities of $6.3 billion.

259.    Chemours also reported that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours also had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

260.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, and which Old DuPont and Chemours knew or should have known would be tens of billions of dollars.

261.    Had Chemours taken the full extent of Old DuPont's legacy liabilities into account, as it should have done, it would have had negative equity (that is, total liabilities that are greater than total assets), not only on a tangible basis, but also on a total equity basis, and, Chemours would have been rendered insolvent at the time of the Chemours Spinoff.

### STEP 2: THE OLD DOW/OLD DUPONT "MERGER"

262.     After the Chemours Spinoff, Old DuPont took the untenable position that it was not responsible for the widespread PFAS contamination that it had caused over several decades. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals business that Old DuPont had transferred to Chemours rested solely with Chemours, not with Old DuPont.

263.     However, Old DuPont could not contractually discharge all its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and that Chemours had assumed.

264.     Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including potentially massive punitive damages. So Old DuPont moved to the next phase of its scheme. On December 11, 2015, less than six months following the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. ("Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

265.     To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc., (i.e., New DuPont) and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

266.     Upon the closing of the DowDuPont Merger, Old Dow merged into one merger subsidiary, and Old DuPont merged into the other merger subsidiary. Thus, because of the merger,

and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

267.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont (i.e., New DuPont).

**STEP 3: THE SHUFFLING, REORGANIZATION, AND FRAUDULENT TRANSFER OF ASSETS AWAY FROM OLD DUPONT AND SEPARATION OF CORTEVA AND NEW DOW**

268.    Following the Dow-DuPont Merger, DowDuPont (i.e., New DuPont) underwent a significant internal re-organization and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

269.    While, again, the details of these transactions remain hidden from Plaintiffs and other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial PFAS liabilities. The significant internal reorganization instituted by DowDuPont (i.e., New DuPont) was in preparation for the conglomerate being split into three, separate, publicly traded companies.

270.    Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont (i.e., New DuPont), which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business"; (ii) the "Specialty Products Business"; and (iii) the "Material Sciences Business."

271.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont (i.e., New DuPont), for far less than the assets were worth.

272.    Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont (i.e., New DuPont) incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business; and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont (i.e., New DuPont) retained the specialty products business, and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

273.    The mechanics of the separations are governed by the April 1, 2019, Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (i.e., New DuPont) (the "DowDuPont Separation Agreement"). The Dow DuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business) and New DuPont (Specialty Products Business), respectively. New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

274.    Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained, i.e., (i) Corteva retained and assumed the liabilities related to the Agriculture Business; (ii)New DuPont retained and assumed the liabilities related to the Specialty Products Business; and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

275. Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science or Specialty Products Businesses, including, upon information and belief, the PFAS liabilities. These assumed PFAS liabilities are allocated on a pro-rata basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to New DuPont and 29% to Corteva.

276. The separation of New Dow was completed on or about April 1, 2019, when DowDuPont (i.e., New DuPont) distributed all New Dow's common stock to DowDuPont stockholders as a pro rata dividend. New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker, "DOW."

277. On or about May 2, 2019, DowDuPont (i.e., New DuPont) consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont (i.e., New DuPont) spun off Corteva as an independent public company.

278. Corteva now holds 100% of the outstanding common stock of Old DuPont. Corteva now also trades on the NYSE under the stock ticker "CTVA."

279. The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all Corteva's common stock to DowDuPont (i.e., New DuPont) stockholders as a pro rata dividend.

280. The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted below with substantially fewer tangible assets than they had prior to the restructuring.

281. On or about June 1, 2019, Dow DuPont changed its registered name to Dupont de Nemours (meaning New Dupont).

282. The net outcome of these transactions was to strip Old Dupont of its substantial tangible assets and transfer them to the new Dupont and Corteva for far less than they were originally worth.

283. Old Dupont expected that the Dow-DuPont merger created 'goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this 'goodwill" was assigned to Old-DuPont Dow-DuPont to prop up its balance sheet. The Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

284. In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

285. For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the fiscal year ended 2019, just months after the Corteva separation, however, Old DuPont reported a net loss of negative $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

286. Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes ("EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

287. The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation. For the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

288.    That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

289.    As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of assets, including "goodwill" from its successive restructuring activities.

290.    At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

291.    Old DuPont's financial condition has continued to deteriorate. By the end of fiscal year 2019, Old DuPont reported $42.397 billion in total assets, half of which (or $21.653 billion) are intangible assets. Old DuPont's reported liabilities for the same period totaled $21.869 billion.

292.    Old DuPont's tangible net worth between September 30, 2019, and December 31, 2019, declined even further, whereby Old DuPont ended fiscal year 2019 with a tangible net worth of negative $1.125 billion.

293.    New DuPont—to which 71% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont, and for which Old DuPont has received less than reasonably equivalent value.

294.    Old DuPont's parent holding company, Corteva—to which 29% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. However Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

**OLD DUPONT AND RELATED ENTITIES' PLANS TO SHIELD ASSETS FROM PFAS LIABILITIES**

295.     By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

296.     Upon information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

297.     In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

298.     At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including PFOA and its chemical precursors.

299.     Upon information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont employees resigned, and seven new members were appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

300.     In or around July 1, 2015, Old DuPont completed the spin-off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

301.     Although many of the details of the Separation Agreement remain largely hidden from the public, upon information and belief, as part of the Separation Agreement, Chemours accepted broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

302.     Additionally, Chemours agreed to assume for itself and indemnify Old DuPont against all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

303.     Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spin-off if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

304.     Upon information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

305.     Old DuPont knew that Chemours was under-capitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

306.     In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

307.    Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiffs and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. Upon information and belief, the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

308.    By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

309.    Upon information and belief, Corteva currently holds Old DuPont as a subsidiary.

310.    Upon information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a *pro rata* basis between Corteva and New DuPont.

## CAUSES OF ACTION

### COUNT I: STRICT LIABILITY - DESIGN DEFECT

311.    Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further allege the following:

312.    As manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants owed a duty to all persons whom their products might foreseeably harm, including Plaintiffs, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

313.    Defendants' AFFF/Component Products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

a. PFAS causes extensive groundwater contamination, even when used in its foreseeable and intended manner;

b. Even at extremely low levels, PFAS render drinking water unfit for consumption;

c. PFAS poses significant threats to public health; and

d. PFAS creates real and potential environmental damage.

314. Defendants knew of these risks and failed to use reasonable care in the design of their AFFF/Component Products.

315. AFFF containing PFOS, PFOA, and/or their chemical precursors poses a greater danger to the environment and to human health than would be expected by ordinary persons such as Plaintiffs.

316. At all times, Defendants were capable of making AFFF/Component Products that did not contain PFOS, PFOA, and/or their chemical precursors. Thus, reasonable alternative designs existed which were capable of preventing Plaintiffs' significant exposures.

317. The risks posed by AFFF containing PFOS, PFOA, and/or their chemical precursors far outweigh the products' utility as a flame-control product.

318. The likelihood that Defendants' AFFF/Component Products would be spilled, discharged, disposed of, or released into the environment and Plaintiffs' water supplies was great. Plaintiffs' water supplies have been, and continue to be, contaminated with PFAS in varying amounts over time, subjecting Plaintiffs' to substantial PFAS exposure that far outweighed any burden on Defendants to adopt an alternative design, and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

319. As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Plaintiffs' water supplies have been and continue to be, contaminated with

PFAS in varying amounts over time, causing Plaintiff's to sustain exposure to Defendants' PFAS chemicals.

320. Defendants knew that it was substantially certain that their acts and omissions described above would contaminate Plaintiffs' water supply with PFAS in varying amounts over time, causing Plaintiffs significant exposures and damages. Contamination that led to the exposure of Plaintiffs to toxins and increased their risk of numerous diseases. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' health and safety.

## COUNT II: STRICT LIABILITY - FAILURE TO WARN

321. This cause of action is asserted against all Defendants on behalf of the Plaintiffs.

322. Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further allege the following:

323. As manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants owed a duty to all persons whom its products might foreseeably harm, including Plaintiffs, not to market any product which is unreasonably dangerous in design for its reasonably anticipated used.

324. Defendants' AFFF/Component Products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

    a. PFAS causes extensive groundwater contamination, even when used in its foreseeable and intended manner;

    b. Even at extremely low levels, PFAS render drinking water unfit for consumption

    c. PFAS poses significant threats to public health; and

    d. PFAS creates real and potential environmental damage.

325.    Defendants knew of the health and environmental risks associated with their AFFF/Component Products and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with their products or an instruction that would have avoided Plaintiffs' exposures.

326.    Despite Defendants' knowledge of the environmental and human health hazards associated with the use and/or disposal of their AFFF/Component Products in the vicinity of drinking water supplies, including PFAS contamination of the drinking supplies, Defendants failed to issue any warnings, instructions, recalls, or advice regarding their AFFF/Component Products to Plaintiffs, governmental agencies or the public.

327.    As a direct and proximate result of Defendants' failure to warn, Plaintiffs' water supplies have been, and continue to be, contaminated with PFAS in varying amounts over time, causing Plaintiffs significant expsoures and damages. Further, this contamination led to the exposure of Plaintiffs to toxins and increased their probabilities of numerous diseases as more fully set forth above.

328.    Defendants knew that it was substantially certain that their acts and omissions described above would contaminate Plaintiffs water supply with PFAS in varying amount, causing Plaintiffs significant exposures and damages. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' health and safety.

## COUNT III: NEGLIGENCE

329.    Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further allege the following:

330.    As manufactures of AFFF products containing PFOS, PFOA, and/or their chemical precursors, Defendants owed a duty to Plaintiffs and to all persons whom their products might

foreseeably harm to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PFAS-containing AFFF.

331.   Defendants owed a duty to Plaintiffs to act reasonably and not place inherently dangerous AFFF products into the marketplace when the AFFF products' release into the air, soil, and water was imminent and certain.

332.   Defendants knew or should have known that PFAS were leaching from AFFF used for fire protection, training, and response activities.

333.   Defendants knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and highly likely to contaminate water supplies if released into the environment.

334.   Defendants knew or should have known that the manner in which they were designing, manufacturing, distributing, and selling their AFFF products would result in contamination of Plaintiffs' water supplies with PFAS in varying amounts over time, causing Plaintiffs significant exposures and damages.

335.   Despite the fact that Defendants knew or should have known that PFAS are toxic, can contaminate water resources, and are carcinogenic, Defendants negligently:

a. designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors;

b. issued deficient instructions on how their AFFF/Component Products should be used and disposed of, thereby permitting PFAS to contaminate the groundwater in and around the Sites;

c.  failed to recall and/or warn the users of their AFFF/Component Products of the dangers of groundwater contamination as a result of standard use and disposal of their products;

d.  failed and refused to issue the appropriate warning and/or recalls to the users of their AFFF/Component Products; and

e.  failed to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

336.    The magnitude of the burden on the Defendants to guard against this foreseeable harm to Plaintiffs was minimal, as the practical consequences of placing this burden on the Defendants amounted to a burden to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products.

337.    As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products, and to take steps to eliminate, correct, or remedy any contamination they caused.

338.    As a direct and proximate result of Defendants' negligence, Plaintiffs' water supplies have been contaminated with PFAS, in varying amounts of time, causing Plaintiffs significant exposures and damages.

339.    Defendants knew that it was substantially certain that their acts and omissions described above would cause Plaintiffs' water supply to be contaminated with PFAS in varying amounts over time, causing Plaintiffs significant exposures and damages. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' health and safety.

**COUNT IV: MEDICAL MONITORING**

340.     Plaintiffs hereby incorporate by reference the allegations contained within paragraphs 1 - 351 of this Complaint as if restated in full herein:

341.     Plaintiffs assert a claim for medical monitoring pursuant to *Petito v. A.H. Robins Co.*, 750 So.2d 103 (Fla. 3d DCA 1999). Such relief is available notwithstanding the absence of manifestations of a present physical injury or symptomatic disease.

342.     Plaintiffs have been exposed to greater than normal background levels of PFAS chemicals and precursors, including but not limited to PFOS and/or PFOA.

343.     PFAS products and their precursors have been linked to serious medical conditions including, but not limited to, kidney cancer, testicular cancer, liver cancer, pancreatic cancer, prostate cancer, breast cancer, colon cancer, ovarian cancer, lymphoma, thyroid disease, thyroid diseases, kidney disease, ulcerative colitis, infertility, and pregnancy induced hypertension.

344.     Defendants' acts and/or omissions have seriously increased the risk of Plaintiffs developing such serious maladies and diseases.

345.     Defendants had a duty to prevent the release into the environment of PFOA and/or PFOS, in the foreseeable uses of their Fluorochemical Products to avoid harming those would consume drinking water in the immediate vicinity, including Plaintiff.

346.     Upon learning of the science-based harm and/or potential harm from PFAS exposure, including results of Defendants' internally conducted tests and government findings, Defendants owed Plaintiffs a duty to act reasonably and to give Plaintiffs adequate warnings. Defendants breached their duties when they negligently continued to manufacture, market, distribute, sell, or use PFAS chemicals in such a manner as to result in the contamination of Plaintiffs' soil, surface water and groundwater, and without giving Plaintiffs adequate warning about the dangers of PFAS to humans and the environment.

347.    The Defendants' separate and distinct negligent acts and/or omissions as alleged *supra* are the proximate cause of higher than normal, in fact, excessive exposure, to hazardous PFAS substances and contaminants.

348.    Monitoring procedures that make the early detection of the diseases correlated to the exposure of referenced PFAS hazardous substances and contaminants currently exist.

349.    The monitoring procedures or regimes are different from those procedures normally recommended that would be used in the absence of the exposure.

350.    The prescribed medical monitoring is reasonably necessary according to contemporary scientific principles for persons such as Plaintiffs who have been exposed and continue to be exposed to excessive levels of the referenced hazardous PFAS chemicals and materials.

351.    Plaintiffs will suffer irreparable harm if the requested medical monitoring program is not implemented because they are in danger of suffering catastrophic latent diseases as a result of their prolonged exposure to toxic and hazardous PFAS substances resulting from the Defendants' negligence.

352.    Detection of these diseases and early treatment is medically reasonable and necessary to prevent progression and further injuries.

353.    Plaintiffs request a permanent injunction which requires the Defendants to fund, but not participate in running, a Court-supervised medical monitoring program which provides for medical testing protocols for conditions caused by exposure to the referenced substances, pursuant to *Petito v. A.H. Robins*.

354.    Plaintiffs request that the Court appoint a plan administrator and reserve jurisdiction to enforce the terms and conditions of the plan.

WHEREFORE, Plaintiffs request that this Court enter an order requiring the Defendants

to fund a Court-supervised medical monitoring program which provides for medical testing protocols for conditions caused by exposure to the referenced substances, as well as the payment of their costs, and expenses, and any other relief this court deems just and proper.

## COUNT V: TOLLING OF THE STATUTE OF LIMITATIONS

355.     Plaintiffs hereby incorporate by reference the allegations contained within paragraphs 1 - 354 of this Complaint as if restated in full herein.

### Discovery Rule Tolling

356.     Plaintiffs did not know, nor could have reasonably discovered by the exercise of reasonable diligence, that exposure to fluorochemical products, including AFFF, was harmful to human health. The risks of said chemicals and AFFF were not obvious to the users of AFFF, nor were they obvious to individuals such as Plaintiffs in the vicinity of AFFF use. Since Plaintiffs could not have reasonably discovered the defects and risks associated with the use of fluorochemical products, they could not protect himself from exposure to Defendants' fluorochemical product. For this reason, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

357.     Plaintiffs had no way of knowing about the risk of serious injury associated with the use of, and exposure to, AFFF and fluorochemical products until very recently. Further, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to AFFF is harmful to human health within the time period allowed by any applicable statute of limitations.

358.     During the relevant times, Plaintiffs did not possess specialized scientific or medical knowledge. Plaintiffs did not, and could not, have discovered or known facts that could cause

a reasonable person to suspect the risk associated with the use of Defendants' fluorochemical products. Further, a reasonable and diligent investigation by Plaintiffs earlier would not have disclosed that AFFF could cause personal injury.

359.     Wherefore, all applicable statutes of limitations pertaining to Plaintiffs' claims have been tolled by operation of the discovery rule.

## Fraudulent Concealment

360.      Rather than disclose critical safety and health information regarding its AFFF and fluorochemical products, Defendants have consistently and falsely represented the safety of AFFF products.

361.     This fraudulent concealment continues to the present day.

362.     Wherefore, due to Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein through the relevant time for this action, all applicable statutes of limitations have also been tolled.

## Estoppel

363.      Defendants were under a continuous duty to consumers, end users, and other persons, such as Plaintiffs, coming into contact with their fluorochemical products, to provide truthful and reliable safety information concerning their products and the risks associated with their use, as well as exposure to AFFF.

364.     Rather than fulfill this duty, Defendants knowingly, affirmatively, and actively concealed important safety information and warnings concerning AFFF and the health risks associated with the same.

365.     Wherefore, Defendants are estopped from relying on any statute of limitations in defense of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek judgments against all Defendants on each of the above-referenced claims and Causes of Action as follows:

(a) An order requiring the Defendants to fund a Court-supervised medical monitoring program which provides for medical testing protocols for conditions caused by exposure to the referenced PFAS substances;

(b) Punitive and/or exemplary damages for the wanton, willful, fraudulent, and/or reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the Plaintiffs and of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct;

(c) Awarding Plaintiffs reasonable fees for attorneys and expert witnesses;

(d) Awarding Plaintiffs the costs of these proceedings;

(e) Awarding pre-judgment and post-judgment interest; and

(f) Such other and further relief as this Court deems just and proper.

## JURY DEMAND

The Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated: August 22, 2025                    Respectfully Submitted,

*/s/Jason P. Frank*
JASON P. FRANK, ESQ.
FLORIDA BAR NO.: 1049042
C. DAVID DURKEE, ESQ.
FLORIDA BAR NO.: 998435
THE DOWNS LAW GROUP, P.A.
3250 Mary Street, Suite 307
Coconut Grove, Florida 33133
Telephone (305) 444-8226
Facsimile: (305)-444-6773
Email: ddurkee@downslawgroup.com
      jfrank@downslawgroup.com

*Attorneys for Plaintiff*